**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VICTOR UKADIKE EZEIBE,** | : | |
| **Plaintiff** | : | **No. 1:19-cv-00189** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **COREY CHIVERS, <u>et al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the Court is Defendants Corey Chivers, Christopher Thompson, Don Davis,

Sheldon Hooper, and John Reisenweber (collectively, "Defendants")' fully briefed Motion to

Preclude the Expert Report and Opinions of John G. Peters, Jr. pursuant to Federal Rule of

Evidence 702.  (Doc. No. 61.)  The Court held a hearing on the pending motion (via Zoom) on

January 11, 2022, at which time Plaintiff Victor Ukadike Ezeibe ("Plaintiff") presented the

testimony of John G. Peters, Jr. ("Dr. Peters").  Upon careful consideration of the briefing and

exhibits associated with the motion, the testimony and arguments offered at the hearing, and the

applicable law, for the reasons provided herein, the Court will grant in part and deny in part the

motion.  Dr. Peters will be permitted to testify as an expert on certain issues at trial; however, his

testimony will be limited as set forth below.

## I.     BACKGROUND

Plaintiff commenced this action on February 4, 2019.  The complaint asserted

constitutional claims under 42 U.S.C. § 1983 as well as state law tort claims against Defendants

John/Jane Does ("Individual Defendants"), in addition to a <u>Monell</u> claim against Defendant City

of York ("Defendant City") for failure to train and supervise Individual Defendants and failure to

create or implement policies that would require Defendant City to document incidents where

police officers draw firearms, all arising out of an engagement between Plaintiff and several City

of York police officers on December 16, 2018.  (Doc. No. 1.)  Defendant City filed a motion to

dismiss the complaint (Doc. No. 8), which the Court granted on November 27, 2019, dismissing

Plaintiff's state law claims with prejudice while granting Plaintiff leave to amend his federal

claims against Defendant City (Doc. Nos. 14, 15).  Plaintiff subsequently filed a motion for leave

to file an amended complaint to add additional claims (Doc. No. 16), which the Court granted on

February 28, 2020 (Doc. No. 23).  Defendant City filed a motion to dismiss Plaintiff's first

amended complaint on March 12, 2020 (Doc. No. 25), which the Court granted on April 21,

2020 (Doc. Nos. 29, 30), dismissing all claims against Defendant City with prejudice, directing

that Defendant City be terminated as a defendant in this case, and further directing Plaintiff to

identify the Individual Defendants within thirty (30) days.  After discovering the identities of the

Individual Defendants, Plaintiff filed a motion for leave to file a second amended complaint to

substitute the names of Defendants (Doc. No. 34), and the Court granted the motion (Doc. No.

38).

Thereafter, Plaintiff filed his second amended complaint ("SAC"), which is the operative

complaint in this matter.  (Doc. No. 39.)  The SAC alleges three claims: (1) false arrest in

violation of the Fourth and Fourteenth Amendments, (2) excessive force in violation of the

Fourth and Fourteenth Amendments, and (3) equal protection, based on the following factual

allegations:

> Plaintiff is Nigerian and works in York City as a pharmacist.  On the evening of
> December 16, 2018, Plaintiff left work and was driving home in his Nissan X-
> Terra; he was driving through an undesirable party of the City so that he could
> stop at the Turkey Hill Mini Market on his way home to buy ice cream for his
> children.  Defendant Corey Chivers followed Plaintiff's vehicle from the Shell
> Gas Station on Roosevelt Avenue to the Turkey Hill Mini Market on West Market
> Street in York, Pennsylvania in his York City police cruiser.

Upon parking his vehicle, Plaintiff heard [] Individual Defendant Chivers shout, "Stay in your car! Do not come out of your car!" which shocked and surprised Plaintiff. Plaintiff waited in his car, as instructed, and observed that he was surrounded by approximately four to five other York City police cruisers. Besides Defendant Chivers, Defendants Sheldon Hooper, John Reisenweber, Don Davis, and Chris Thompson appeared. Defendant Chivers ordered Plaintiff to drop his car keys out the window, to which Plaintiff complied. After one of the Defendants collected Plaintiff's car keys from the ground near the driver's window, Plaintiff observed the reflection of another Defendant in the side mirror aiming a firearm at Plaintiff. Plaintiff looked to the right and left and observed two other Defendants with firearms aimed at him. All of the Defendants were Caucasian. The realization that three Defendants were surrounding Plaintiff and were pointing firearms at him provoked feelings of terror in Plaintiff. The fact that the Defendants were Caucasian and Plaintiff being a Black male heightened Plaintiff's anxiety.

The Defendants ordered Plaintiff to exit his vehicle with his hands up and walk backwards; Plaintiff complied with this order. Two of the Defendants seized Plaintiff's person, including his underwear and pockets. The Defendants then confined Plaintiff within the back seat of a police cruiser while they searched Plaintiff's Nissan X-Terra. Following the search of Plaintiff's vehicle, the Defendants escorted him out of the back of the police cruiser, causing a cut or abrasion to Plaintiff's person in the process. The incident of December 16, 2018 between the Defendants and Plaintiff has caused mental and emotional suffering to Plaintiff, including nightmares and panic attacks causing Plaintiff to physically shake. Approximately three days following the incident of December 16, 2018, Plaintiff contacted the York City Police to inquire about information concerning the incident and was informed that here were no records pertaining thereto. The fact that York City has no record of the December 16, 2018 incident involving Plaintiff suggest that the Defendants acted unlawfully and purposely omitted documenting and/or recording the incident.

(Id. ¶¶ 9-28.) After Defendants filed an answer to the SAC (Doc. No. 44), the Court held a case management conference and entered a scheduling order, setting a close of fact discovery date of January 15, 2021 (Doc. No. 48). After the parties jointly requested an extension of that deadline to February 15, 2021 (Doc. No. 49), the Court held a post-discovery status conference with the parties and thereafter issued a scheduling order establishing deadlines for expert discovery and setting a status call for a date in June 2021. (Doc. Nos. 53, 54.)

The Court held a status conference with the parties on June 18, 2021 (Doc. No. 56), at which time the parties discussed the potential filing of a motion to preclude expert testimony, to be resolved prior to setting a dispositive motion deadline.  No order was issued following the status conference; however, the expectation of all parties on the call was that any motions to preclude would be filed within two (2) weeks of the date of the status conference, or by July 2, 2021.  On July 2, 2021, Defendants filed a Motion to Preclude the Expert Report and Opinions of John G. Peters, Jr.  (Doc. No. 57.)  The motion was not accompanied by a brief.  When no brief in support of the motion was filed within fourteen (14) days, the Court, in accordance with Local Rule 7.5, issued an Order on July 20, 2021, deeming Defendants' motion withdrawn.  (Doc. No. 58.)  On that same date, Defendants' counsel filed a letter with the Court stating that she had inadvertently failed to file a brief in support of the motion, asking the Court for permission to refile the motion and a supporting brief.  (Doc. No. 59.)  Plaintiff's attorney immediately filed a letter response objecting to Defendants' request.  (Doc. No. 60.)  Thereafter, Courtroom Deputy Dawn McNew emailed counsel on behalf of the Court, acknowledging the Court's receipt of the parties' letters, and advising that the Court would act only upon motion.  Specifically, the email stated that "[s]hould Defendants' counsel refile the motion in compliance with the Local Rules of this Court, any objection thereto should be made by way of a motion."

On July 23, 2021, Defendants again filed their Motion to Preclude the Expert Report and Opinions of John G. Peters, Jr. (Doc. No. 61), which attached as an exhibit the Report of Dr. Peters (Doc. No. 61-3), and filed a brief in support of the motion on July 26, 2021 (Doc. No. 63). Subsequently, on July 30, 2021, Plaintiff filed a Motion to Strike Motion to Preclude the Expert Report and Opinions of John G. Peters, Jr. (Doc. No. 64), with a brief in support (Doc. No. 65).

On August 30, 2021, Defendants filed a brief in opposition to the motion to strike.  (Doc. No. 67.)

By Order dated October 19, 2021, the Court denied Plaintiff's motion to strike and directed Plaintiff to file any opposition to Defendants' motion by November 3, 2021.  (Doc. No. 68.)  Plaintiff filed his brief in opposition to Defendants' motion to preclude on October 29, 2021 (Doc. No. 69),[1] and Defendants filed their reply brief on November 12, 2021 (Doc. No. 70).  As noted above, a hearing on the motion was held via Zoom on January 11, 2022.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  See Fed. R. Evid. 702.  Rule 702 states, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See id.

As the United States Court of Appeals for the Third Circuit has explained, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  See Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  The rule imposes an obligation on district court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those three threshold requirements before consideration by a jury.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  In

---

[1] Plaintiff attached as an exhibit to his brief in opposition the Curriculum Vitae of Dr. Peters (Doc. No. 69-3).

fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to admit or deny expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997).

When considering the qualification requirement, a court must discern whether a purported expert has specialized knowledge in a given field.  See Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  In undertaking this inquiry, no particular background or credentials are necessary to establish the requisite specialized knowledge, as "a broad range of knowledge, skills, and training qualify an expert."  See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); accord Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness's generalized knowledge or practical experience may be sufficient to qualify him as an expert).  While the Third Circuit has instructed that a court must "eschew[] imposing overly vigorous requirements of expertise," the determination of whether an expert is qualified to testify about a particular topic is not one that has been reduced to a mere formality, as the Court's assessment of a proposed expert's qualifications is predominantly a fact-specific endeavor that is governed by the unique circumstances in each case.  See Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).

As for the reliability requirement, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  See Kumho Tire, 526 U.S at 152.  To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary

requirement of reliability is lower than the merits standard of correctness." See Pineda, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.'" See In re TMI Litig., 193 F.3d 613, 664 (3d Cir. 1999) (citation omitted). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009) (citing In re Paoli, 35 F.3d at 746). When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993):

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See In re Paoli, 35 F.3d at 742 n.8. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." See Kumho Tire, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003).

In cases like this one "where an expert is proffered to testify regarding non-scientific matters, '[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience' of the witness and the methodology used will be applying that experience to the facts of the case." See Jackson v. City of Pittsburgh, No. 07-111, 2010 WL 3222137, at *9 (W.D. Pa.

7

Aug. 13, 2010) (quoting <u>Roberson v. City of Philadelphia</u>, No. 99-3574, 2001 WL 210294, at *5

n.10 (E.D. Pa. Mar. 1, 2001) (internal quotation omitted)); <u>see also</u> Fed. R. Evid. 702, Advisory

Comm. Notes, 2000 Amd. (stating that "when a law enforcement agent testifies regarding the use

of code words in a drug transaction, the principle used by the agent is that participants in such

transactions regularly use code words to conceal the nature of their activities.  The method used

by the agent is the application of extensive experience to analyze the meaning of

conversations.").  Accordingly, when testimony is proffered regarding non-scientific matters, the

expert's qualifications and experience set the boundaries for his or her testimony.

Under the third requirement—fit—"the expert's testimony must be relevant for the

purposes of the case and must assist the trier of fact."  <u>See</u> <u>Schneider</u>, 320 F.3d at 404.  "Rule

702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a

precondition to admissibility."  <u>Daubert</u>, 509 U.S. at 591-92.  Indeed, an expert who renders an

opinion based on factual assumptions not present in the case or opines on a matter that does not

relate to a disputed issue is not relevant and thus, will not assist the trier of fact, as required by

Rule 702.  <u>See</u> <u>id.</u>  For example:

> The study of the phases of the moon, for example, may provide valid scientific
> "knowledge" about whether a certain night was dark, and if darkness is a fact in
> issue, the knowledge will assist the trier of fact.  However (absent creditable
> grounds supporting such a link), evidence that the moon was full on a certain
> night will not assist the trier of fact in determining whether an individual was
> unusually likely to have behaved irrationally on that night.

<u>See</u> <u>id.</u>  Like the typical relevance inquiry, the standard for analyzing the fit of an expert's

analysis to the case at hand is "not that high."  <u>See</u> <u>United States v. Ford</u>, 481 F.3d 215, 219-20

(3d Cir. 2007) (quoting <u>In re Paoli</u>, 35 F.3d at 745).  However, expert testimony can be powerful

and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that

"district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of Daubert."  See id. at 219 n.6.

Further, a qualified non-scientific expert cannot offer an opinion on the ultimate legal issue in a particular case "because to permit this type of evidence would subvert the jury's function to decide the disputed facts and issues after being properly instructed as to the law by the court."  See Jackson, 2010 WL 3222137, at *9; Roberson, 2001 WL 210294, at *5 n.10 (excluding proffered expert testimony to the effect that an officer's conduct was "deliberately indifferent" toward plaintiff); Whitmill v. City of Philadelphia, 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998) (finding that expert was precluded from expressing opinion regarding legality of detainee's stop and transportation); Burger v. Mays, 176 F.R.D. 153, 157 (E.D. Pa. 1997) (concluding that expert was precluded from testifying that officer "unreasonably seized" the arrestee).

## III.   DISCUSSION

As an initial matter, in order to provide context to the opinions proffered by Dr. Peters in support of Plaintiff's claims against Defendants, the Court briefly reviews the law applicable to the claims asserted by Plaintiff in the SAC pursuant to 42 U.S.C. § 1983.  Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002)).  To maintain a cause of action under Section 1983, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States.  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

Count I of the SAC purports to assert a claim of false arrest in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983.  (Doc. No. 39 at 5.)  Specifically, the SAC alleges that Defendants "violated Plaintiff's constitutional right to be free from unreasonable searches and seizures by arresting him, confining him, and searching his person and his vehicle without probable cause or reasonable suspicion."  (Id. ¶ 32.)  The Court notes that, while the SAC refers to the term "arrest" in a general way, the details of the SAC indicate that Plaintiff was ordered out of his vehicle, handcuffed, searched, and placed in a police cruiser for a period of time.  (Id. at ¶¶ 21-25.)

The Fourth Amendment protects individuals against "unreasonable searches and seizures."  See U.S. Const. amend. IV.  An arrest is a clear example of a seizure; however, actions short of an arrest may constitute a seizure for Fourth Amendment purposes if a law enforcement officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  See Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).  For example, "temporary detention of individuals during the stop of an automobile by police, even if only for a

10

brief period and for a limited purpose, constitutes a 'seizure' of 'persons' under the Fourth

Amendment." See Hadesty v. Rush Twp. Police Dep't, No. 3:14-cv-2319, 2016 WL 1039063, at

*6 (M.D. Pa. Mar. 15, 2016) (citing Wren v. United States, 517 U.S. 806, 809-10 (1996)).

Accordingly, "the Fourth Amendment requires a police officer conducting a traffic stop to have

at least reasonable suspicion of criminal activity." See id. (citing Delaware v. Prouse, 440 U.S.

648, 654 (1979)).  A court's determination as to the existence of reasonable suspicion assesses

"the totality of the circumstances surrounding the stop." See Hadesty, 2016 WL 1039063, at *6

(citing Wren, 517 U.S. at 810).

Count II of Plaintiff's SAC asserts a claim of excessive force in violation of the Fourth

and Fourteenth Amendments.  (Doc. No. 39 at 6-7.)  A claim of excessive force utilized in

connection with an investigatory stop, arrest, or other seizure is analyzed under the Fourth

Amendment "reasonableness" standard.  See Graham v. Connor, 490 U.S. 386, 395 (1989).  In

assessing such a claim, a court determines whether an officer's actions were reasonable "from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight" because "the question is whether the officers' actions are 'objectively reasonable' in

light of the facts and circumstances confronting [the officers], without regard to their underlying

intent or motivation." See id. at 396-97 (citing Scott v. United States, 436 U.S. 128, 137-39

(1978)).  This reasonableness inquiry "requires careful attention to the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight." See id. at 396.

Count III of the SAC asserts an equal protection claim under 42 U.S.C. § 1983, alleging that the Defendants "engaged in racial profiling when they confronted Plaintiff with drawn guns, then tackling and searching him."  (Doc. No. 39 ¶ 58.)  The Fourteenth Amendment provides that a state may not "deny to any persons within its jurisdiction the equal protection of the laws."  See U.S. Const. amend. XIV.  "The central purpose of the Clause is to prevent the States from purposely discriminating between individuals on the basis of race."  Johnson v. Fuentes, 704 F. App'x 61, 65 (3d Cir. 2017) (internal citations and quotation marks omitted) (unpublished).  Accordingly, the elements of a Section 1983 equal protection claim based on intentional racial animus are: (1) the plaintiff belongs to a protected class; (2) the defendant acted under color of state law; and (3) the defendant treated plaintiff differently because of his or her race.  See id.

Plaintiff has tendered Dr. Peters as an expert in law enforcement practices who will testify on four specific points relating to the above claims, all of which are challenged by Defendants by way of their motion to preclude.[2]  The four opinions at issue are the following:

(1) Plaintiff did not force Officer Chivers to initiate the traffic stop after pulling into the Turkey Hill parking lot as described by York City Police Department Internal Affairs Inspector Michael P. Davis;

(2) Officer Chivers failed to thoroughly read the information sent to him by Dispatch that the stolen vehicle had a Texas license plate number, which was a material cause in the intentional detection and seizure of [Plaintiff];

(3) Officer Chivers violated officer safety principles and guidelines when he decided to engage [Plaintiff] in the Turkey Hill parking lot prior to the arrival of back-up police officers, which would have also given Officer Chivers [time] to thoroughly read the CAD message; and

---

[2] Dr. Peters' Report actually opines on five separate points; however, in response to Defendants' motion, Plaintiff has represented that he does not oppose the preclusion of Dr. Peters' testimony on the fifth point.  Accordingly, there are four opinions at issue.

12

(4) The uses of force by Officer Chivers and the other [York City Police] officers on the scene who had drawn their handguns and pointed them at Plaintiff and who physically contacted him, including handcuffing him, were inconsistent with national use-of-force standards, recommendations, and guidelines.

(Doc. No. 61-3 at 5.)

Defendants' motion to exclude the report and potential testimony of Dr. Peters argues that "[Dr.] Peters' opinions do not bear on the legal claims in this case," and maintains that "[t]hey are rife with insufficient facts and data, are the products of unreliable principles and methods, and are misapplied to the facts of this case." (Doc. No. 61 at 8.) In response to Defendants' motion, Plaintiff catalogues Dr. Peters' extensive background in the area of police procedures and maintains that, "[i]n terms of methodology, [Dr.] Peters' Report follows the accepted practice of other police liability experts, which is to apply his extensive education, work experience, academic experience, knowledge and training to the facts of the case, and draw conclusions or opinions based on his experience and knowledge." (Doc. No. 69 at 4.) Plaintiff also maintains that, to the extent Defendants dispute various aspects of Dr. Peters' opinions, the appropriate remedy is not preclusion but cross-examination at trial. (Id. at 8.)

The Court first addresses Dr. Peters' qualification to offer expert testimony in the area of law enforcement practices, and relatedly, the reliability of his methodology, and then assesses the "fit" of each of the opinions proffered by Plaintiff to the facts of this case.

A.     Qualification

While Defendants do not directly challenge Dr. Peters' qualifications, their arguments questioning the reliability of his methods appear to challenge his qualifications, because the reliability inquiry focuses on an expert's methodology and whether an expert has good grounds for his opinion, and, with regard to police liability and other non-scientific experts, the

13

methodology utilized is typically the application of personal knowledge and experience to the

facts of the case.  See Nye v. Mistick, No. 1:13-cv-1905, 2015 WL 11511580, at *5 n.4 (M.D.

Pa. Feb. 25, 2015); Jackson, 2010 WL 3222137, at *9.

      Having considered the arguments raised in the parties' briefing, the testimony offered at

the January 11, 2022 hearing, and Dr. Peters' Report, the Court easily concludes that Dr. Peters

is qualified to offer opinions and testimony with regard to law enforcement practices.  As

catalogued in his sixty-nine (69) page Curriculum Vitae, Dr. Peters has extensive experience in

police procedures during his fifty-year career in law enforcement, which began with a position as

a police officer with the Northern York County Regional Police Department in the early 1970s.

(Doc. No. 69-3 at 4.)  Dr. Peters has served in a number of positions with a variety of law

enforcement organizations and related companies over the course of his career, including the

following: York County Sheriff's Department, Waltham Police Academy, Braintree Police

Department, Institute for Liability Management, Reliapon Police Products, Inc., United States

Secret Service Defensive Tactics Advisory Panel, Defensive Tactics Institute, Inc., and the

Institute for the Prevention of In-Custody Deaths.  (Id. at 2-4.)  At present, Dr. Peters holds the

position of Interim Executive Director of Americans for Effective Law Enforcement, in which

position he coordinates various educational seminars for law enforcement.  (Id. at 1, 8.)  Dr.

Peters is a leader in several law enforcement training organizations, and serves as a consultant in

the areas of police, correctional, security, and municipal practices to various federal, state, city,

county, and international criminal justice agencies.  (Id. at 2, 7.)  With regard to his educational

background, in addition to a Bachelor of Science degree in Criminal Justice, Dr. Peters holds

three master's degrees in various fields, as well as a Doctor of Philosophy degree in Applied

Management and Decision Sciences.  (Id. at 1.)  Dr. Peters has taught at numerous universities over the course of his career, lecturing in the areas of criminal justice, public safety, psychology, and communications.  (Id. at 4-5, 66-69.)  Over the years, he has authored many publications in the area of law enforcement, including numerous textbooks, articles, and handbooks.  (Id. at 23-42.)  Further, at the hearing on Defendants' motion, Dr. Peters testified that he has been qualified as a policing expert approximately 200 times, including in this Court and in the Eastern District of Pennsylvania.  (Doc. No. 75 at 55.)  Upon consideration of all of the above, the Court finds that Dr. Peters is qualified to offer testimony as an expert in the area of law enforcement practices, and accordingly, turns to an assessment of the reliability of his opinions offered in this case.

**B.     Reliability**

As noted above, the reliability inquiry focuses on an expert's methodology and whether he or she has good grounds for the opinion offered.  See In re Paoli, 35 F.3d at 746.  With regard to police liability and other non-scientific experts, the methodology utilized is typically the application of personal knowledge and experience to the facts of the case.  See Nye, 2015 WL 11511580, at *5 n.4; Jackson, 2010 WL 3222137, at *9.

Dr. Peters' Report describes his methodology as including "comparing the actions of the Law Enforcement Officers (LEO) involved in this incident, against that which is generally accepted training and operational practices and procedures in the correctional profession" in arriving at the opinions offered in this case.  (Doc. No. 61-3 at 4-5.)  Plaintiff notes that, in preparing his Report, Dr. Peters "reviewed the material produced during discovery, which included all of the body cam videos produced by Defendants, Defendants' responses to

15

interrogatories, the internal affairs report, the parties Rule 26 Disclosures, York County directives and policies regarding the use of force, the York County Dispatch logs, and the deposition testimony of John Reisenweber and Victor[] Ezeibe." (Doc. No. 69 at 5.)

Further, at the hearing on Defendants' motion, and in accordance with his written report, Dr. Peters testified that, in addition to his education, training, and experience (described supra), he utilized various qualitative and quantitative research methodologies in developing the opinions offered in this case, including Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study. (Doc. Nos. 61-3 at 4; 75 at 48-50.) As an example, Dr. Peters testified that he utilized the methodology of Historiography, which pertains to the history of an event, when he viewed the body camera video of the incident underlying the claims asserted in Plaintiff's SAC. (Doc. No. 75 at 48.) He also testified that he utilized Content Analysis, which examines the contents of a particular document, when reviewing Defendant Chivers' report regarding the incident and comparing it to general procedures and industry standards in forming his opinions. (Id. at 53.)

Upon consideration of the parties' briefing, the testimony offered at the hearing, and Dr. Peters' Report, and noting that, in challenging the reliability of Dr. Peters' opinions, Defendants offer little more than a conclusory argument that Dr. Peters "does not apply reliable principles and methods to the facts of this case in reaching [his] opinion[s]" (Doc. No. 63 at 4), and cite no authority in support of their argument, the Court concludes that, as a general matter, Dr. Peters has utilized a reliable methodology, or the application of his considerable experience, training, and skills to the facts provided to him, in forming his opinions offered in this case. See Nye,

16

2015 WL 11511580, at *5 n.4.  The Court turns to an assessment of the "fit" of each individual opinion offered to the facts of this case.

C.      Fit

As noted <u>supra</u>, with regard to "fit," "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  <u>See</u> <u>Schneider</u>, 320 F.3d at 404.  In this regard, "[n]ot only must the expert's principles and methodology be reliable, but the expert's application of those principles and methods to the facts of the case must be reliable, as well." <u>See</u> <u>Nye</u>, 2015 WL 11511580, at *3.  A non-scientific expert "must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative."  <u>See</u> <u>Jackson</u>, 2010 WL 3222137, at *9 (internal citation omitted).  The Court will address the "fit" of each of the four opinions offered by Dr. Peters in turn.

1.      Opinion One

As noted above, Dr. Peters' first opinion consists of his statement that "Mr. Ezeibe did not <u>force</u> Officer Corey Chivers to initiate the traffic stop after pulling into the Turkey Hill parking lot as described by York City Police Department Internal Affairs Inspector Michael P. Davis."  (Doc. No. 61-3 at 5.)  As noted by Plaintiff, this opinion addresses the Internal Affairs Investigation conducted by the York City Police Department regarding the Plaintiff's stop and arrest, and "concludes that Inspector Davis, who conducted the investigation, incorrectly concluded that the Plaintiff forced Officer Corey Chivers to initiate the traffic stop after pulling into the Turkey Hill parking lot."  (Doc. No. 69 at 6.)  Dr. Peters' opinion states that "[t]his investigative conclusion appears to serve as 'justification' for the traffic stop in the parking lot,

and conflicts with Officer Chivers' description of why he decided to activate his lights after [Plaintiff] had pulled into the parking lot."  (Doc. No. 61-3 at 5.)

Defendants argue that this opinion is "irrelevant considering the legal issues at issue in this case, namely false arrest, excessive force, and equal protection, and will not assist the trier of fact."  (Doc. No. 63 at 4.)

In response, Plaintiff argues that, in connection with his false arrest claim, and in accordance with the Fourth Amendment's requirement that a police officer conducting a traffic stop have at least a reasonable suspicion of criminal activity, "[t]he reason Officer Corey Chivers stopped the Plaintiff, pulled him out of the car, and handcuffed him is therefore the essential element in the Fourth Amendment illegal seizure claim."  (Doc. No. 69 at 6.)  Accordingly, Plaintiff maintains that Dr. Peters' opinion, which challenges Inspector Davis' conclusion that Plaintiff's conduct "forced" the traffic stop, "is relevant and fits the seizure issue because it addresses a proffered legal justification for the stop."  (Id. at 7.)

The Court notes that Dr. Peters' opinion on this point also offers a conclusion regarding the organizational atmosphere at the York City Police Department.  He states that "Inspector Davis' conclusion about why Officer Chivers decided to stop Mr. Ezeibe is without merit, and only serves to insulate Officer Chivers from criticism.  It also appears to perpetuate and/or creates an organizational atmosphere that intentionally protects law enforcement officers and/or ratifies law enforcement officer misconduct."  (Doc. No. 61-3 at 6.)  He further states that:

> Sergeant John Reisenweber (Sergeant Reisenweber) testified he had a similar event in 2006 or 2007 where he stopped a "stolen" car as reported by Dispatch only to discover it was not stolen (Reisenweber deposition, 18:14; 20:11).  Given this type of incident had happened at least one time prior to the Ezeibe traffic stop, Inspector Davis' misrepresentation of why Officer Chivers was "forced" to stop Mr. Ezeibe's vehicle send[s] a clear message that the YPD organization

culture is biased toward protecting its law enforcement officers and confirming the YPD leadership and supervision has your back and will protect you—even if officers demonstrated outrageous behavior.

(Id.)

Upon careful consideration of the parties' briefs, Dr. Peters' Report, the testimony offered at the hearing, the SAC, and relevant authorities, the Court concludes that, because Inspector Davis' conclusion in his after-the-fact report as to the reason why Officer Chivers initiated the stop of Plaintiff is not probative of whether the stop of Plaintiff was in violation of the Fourth Amendment, Dr. Peters' opinion regarding the same is similarly not "relevant for the purposes of the case." See Schneider, 320 F.3d at 404. Both Plaintiff and Defendants correctly recognize that, under the applicable Fourth Amendment law, the reason Officer Chivers stopped the Plaintiff, removed him from his vehicle, and handcuffed him, and the reasonableness of those actions under the totality of the circumstances, is the relevant inquiry for purposes of Plaintiff's Fourth Amendment seizure claim. Accordingly, Inspector Davis' after-the-fact conclusions are simply irrelevant to the legal issues before the Court, and therefore, any opinion offered by Dr. Peters as to those conclusions is similarly irrelevant.[3] The Court will preclude Dr. Peters' testimony as to opinion one.

## 2.    Opinion Two

Dr. Peters' second opinion concludes that "Officer Chivers failed to thoroughly read the information sent to him by Dispatch that the stolen vehicle had a Texas license plate number,

---

[3] The Court notes that Dr. Peters' broader opinion regarding how Inspector Davis' conclusion reflects the organizational atmosphere of the York City Police Department is also irrelevant to Plaintiff's Fourth Amendment seizure claim, because while Plaintiff's initial complaint asserted a Monell claim against the City of York alleging a failure to train resulting in instances of unconstitutional seizures, any such claim against the City of York (and indeed, all claims against the City of York) were dismissed with prejudice by this Court's Memorandum and Order dated April 21, 2020. (Doc. Nos. 29, 30.)

19

which was a material cause in the intentional detection and seizure of [Plaintiff]." (Doc. No. 61-3 at 6.) Dr. Peters' Report continues:

> Officer Chivers knew or should have known to always read and validate the information sent to [him] by Dispatchers via his mobile digital terminal (MDT). This is especially true when an officer is running a Pennsylvania license plate through dispatch. When running a Pa tag, all 50 states are searched. This significantly increases the possibility of having a "false hit" being reported to the officer by the dispatcher of a vehicle being stolen.

(Id.)

In response to Officer Chivers' report, which apparently states that he did not have time to read the MDT message in its entirety until after Mr. Ezeibe was handcuffed and placed in the back of his vehicle, and upon review of the "body-worn camera timecode and dispatch records," Dr. Peters opines that "Officer Chivers had time to thoroughly review the CAD information that informed him the Ezeibe vehicle was not stolen." (Id. at 6-7.) His Report continues:

> Based upon my education, training, and experience, a trained police officer, like Officer Chivers, wants to unequivocally confirm the vehicle he has identified is stolen and that he has read the entire CAD message. Officer Chivers failed to read the entire CAD message that informed him [that] Ezeibe's Pennsylvania vehicle was not stolen, even though he had time to read the message before approaching Mr. Ezeibe. Further, an experienced police officer, like Officer Chivers, knows dispatchers, who do not receive the same law enforcement training as police officers, make mistakes, especially when the tag search is not State specific, and knows that he does not work for the dispatchers and that they do not work for him. It is Officer Chivers who must validate the information given to him by the dispatchers, and in this case, the correct information was given to him, but he failed to read it prior to making aggressive contact with Mr. Ezeibe.

(Id. at 7.) Dr. Peters concludes: "[b]ased upon my education, training, and experience, had Officer Chivers read the CAD message in its entirety that informed him that the Ezeibe vehicle was not stolen, the confrontation with [Plaintiff], the seizure of [Plaintiff], and the

embarrassment caused to [Plaintiff] by being seized and handcuffed in a public venue would have been avoided."  (Id.)

In challenging this opinion, Defendants argue that it "is not based upon sufficient facts or data," and "fails to address or analyze any treatises, standards, or experiences," and therefore, "lacks a factual foundation and is conclusory, speculative, and/or subjective."  (Doc. No. 63 at 7.)  Defendants also argue that "[w]hether [Officer Chivers] had enough time to review the CAD report is for the jury to decide within the context of the law," and is "not proper testimony by an expert."  (Doc. No. 70 at 4.)

In opposition to Defendants' motion, Plaintiff argues that Dr. Peters' conclusions are supported by the body camera video, and maintain that, "to the extent Defendants dispute those conclusions, they are the subject of rigorous cross-examination and not preclusion."  (Doc. No. 69 at 10-11.)

Upon careful consideration of the parties' briefs, Dr. Peters' Report, the testimony offered at the hearing, the SAC, and relevant authorities, the Court concludes that Plaintiff may offer the opinion of Dr. Peters in reference to the CAD message, with some limitations.  The Court concludes that Dr. Peters' testimony regarding appropriate police procedures related to information received by a police officer from a dispatcher via a Mobile Digital Terminal, or "MDT," especially with regard to the specifics of a search of a Pennsylvania license plate (as opposed to a license plate from another state), and whether the officers' conduct here conformed to those procedures, is an appropriate subject of expert testimony that will assist the jury in making an ultimate determination as to whether the actions taken by Officer Chivers and the other Defendants with regard to the stop of Plaintiff and the force utilized in connection with that

stop were reasonable under the totality of the circumstances.  The Court notes that, to the extent Defendants dispute the conclusion offered by Dr. Peters with regard to the CAD message and Officer Chivers' conduct, that is properly a subject of cross-examination by Defendants.  See Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 807 (3d Cir. 1997) (finding that, when an expert employs a reliable methodology, "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination").

While the Court will permit Dr. Peters to offer testimony regarding appropriate police procedures relevant to information received by officers from a dispatcher via MDT, the Court will not permit Dr. Peters to testify regarding what Officer Chivers "knew" or "knows", as in: (1) "Officer Chivers knew or should have known to always read and validate the information sent by Dispatchers via his mobile digital terminal (MDT)"; and (2) "an experienced police officer, like Officer Chivers, knows dispatchers, who do not receive the same law enforcement training as police officers, make mistakes, especially when the tag search is not State specific, and knows that he does not work for the dispatchers and that they do not work for him."  (Doc. No. 61-3 at 6, 7) (emphasis added).  Such testimony is speculative and, moreover, strays into the province of the jury and its determination on the ultimate legal question as to the reasonableness of the conduct of Officer Chivers under the totality of the circumstances.  See, e.g., Burger, 176 F.R.D. at 157 (finding that "[a]ny testimony that the Defendant's use of force was unreasonable under the circumstances or that the Defendant unreasonably seized the Plaintiff would be instructing the jury what result to reach and would be expressing a legal conclusion").  The Court will limit Dr. Peters' testimony on this point accordingly.

### 3.   Opinion Three

Dr. Peters' third opinion proffered in his Report consists of his statement that "Officer Chivers violated officer safety principles and guidelines when he decided to engage Mr. Ezeibe in the Turkey Hill parking lot prior to the arrival of back-up police officers, which would have also given Officer Chivers [time] to thoroughly read the CAD message."  (Doc. No. 61-3 at 5.)

Dr. Peters elaborates on this opinion as follows in his Report:

> Engaging the driver of a suspected stolen vehicle in a public parking lot in the front of a busy marketplace is unsafe for everyone: suspect driver, primary police officer, back-up police officers, store personnel, customers, bystanders, and nearby residents.
>
> . . . .
>
> Based upon my education, training, and experience, there was not a compelling reason for Officer Chivers to engage Mr. Ezeibe in the public parking lot of the Turkey Hill business.  There was also no compelling reason to request back-up officers to respond to the Turkey Hill parking lot and engage Mr. Ezeibe.  Officer Chivers had a practical and available alternative to engaging Mr. Ezeibe in the parking lot by simply parking, waiting for Mr. Ezeibe to complete his business at Turkey Hill, and then follow him from the parking lot to a planned location for a traffic stop where other officers would be waiting.  Instead of planning the traffic stop, Officer Chivers deliberately decided to use a seat-of-the-pants approach to engage Mr. Ezeibe in a public parking lot, resulting in the need to use potentially deadly force.

(Id. at 7-8.)  Dr. Peters opines that Officer Chivers failed to follow standard threat assessment guidelines as set forth in a widely accepted law enforcement officer safety textbook, The Tactical Edge:  Surviving High-Risk Patrol, in connection with his engagement with Plaintiff.  (Id. at 8.) Dr. Peters further states that "[i]nstead of rushing to contact Mr. Ezeibe, if Officer Chivers had taken the time to plan for the traffic stop that would have given him better control over the stop and the location, he could have also used this brief time to thorough[ly] read the CAD message that would have negated the need to contact Mr. Ezeibe and/or use force on him."  (Id.)  He concludes: "Officer Chivers had no reasonable belief that Mr. Ezeibe was armed or dangerous or

23

even had a weapon and at best could have cited him for driving without having his headlights illuminated.  In essence, Officer Chivers created the need to use force resulting in Mr. Ezeibe's unnecessary detention."  (<u>Id.</u> at 8-9.)

In challenging this opinion, Defendants argue that Dr. Peters' opinion is "conclusory, speculative and/or subjective," and maintain that Dr. Peters "does not apply the principles and methods cited in the textbook to the facts of the case with consideration to the claims at issue." (Doc. No. 63 at 6-7.)

Defendants' challenge is largely unavailing.  The Court will permit Dr. Peters' testimony on this point, with some limitations.  The Court concludes that Dr. Peters' third opinion, which compares the actions of Officer Chivers with applicable officer safety principles and guidelines in connection with the stop of Plaintiff, results from a reliable application of Dr. Peters' extensive experience and training, as well as reference to the cited textbook, to the facts of this case.  Further, the Court finds that Dr. Peters' testimony as to proper officer safety practices and procedures when planning the stop of a suspect, and whether Officer Chivers' conduct conformed to those standards in connection with his engagement of Plaintiff, is an appropriate subject of expert testimony that will assist the jury in making an ultimate determination as to the reasonableness of Defendants' behavior under the totality of the circumstances.  <u>See</u> <u>Burger</u>, 176 F.R.D. at 156 (permitting plaintiff's expert to testify that defendant failed to follow proper police procedures in connection with seizure of plaintiff).

However, the Court will not permit Dr. Peters to opine regarding Officer Chivers' intent or knowledge, as in: "Officer Chivers <u>deliberately decided</u> to use a seat-of-the-pants approach to engage Mr. Ezeibe in a public parking lot, resulting in the need to use potentially deadly force";

and "Officer Chivers <u>had no reasonable belief</u> that Mr. Ezeibe was armed or dangerous or even

had a weapon and at best could have cited him for driving without having his headlights on.   In

essence, Officer Chivers created the need to use force resulting in Mr. Ezeibe's unnecessary

detention." (Doc. No. 61-3 at 8-9) (emphasis added).  Such testimony is speculative, and further,

improperly invades the province of the jury as factfinder and is tantamount to an opinion on the

ultimate legal question of the reasonableness of the engagement of Mr. Ezeibe under the totality

of the circumstances.  <u>See</u> <u>Burger</u>, 176 F.R.D. at 157 (finding that testimony "that the Defendant

unreasonably seized the Plaintiff would be instructing the jury what result to reach and would be

expressing a legal conclusion").  The Court will limit Dr. Peters' testimony on this point

accordingly.

### 4.     Opinion Four

Dr. Peters' fourth opinion concludes that "[t]he uses of force by Officer Chivers and the

other YPD police officers on the scene who had drawn their handguns and pointed them at Mr.

Ezeibe and who physically contacted him, including handcuffing him, were inconsistent with

national use-of-force standards, recommendations, and guidelines." (Doc. No. 61-3 at 5.)  In

connection with this conclusion, Dr. Peters considers: (1) whether Plaintiff was an immediate

threat to Officer Chivers, other individuals, or himself; (2) whether Plaintiff actively resisted

Officer Chivers and the other officers; and (3) and the crime committed by Plaintiff at the time

he was seized.  (<u>Id.</u> at 9-10.)

In their brief in support of their motion to preclude, Defendants argue that Dr. Peters does

not fully apply the standards of <u>Graham v. Conner</u> in reaching his conclusions and further

maintain that his opinion is "conclusory" and without support by way of a reliable methodology.

(Doc. No. 63 at 7-9.)  Defendants also take issue with the statement in this section of Dr. Peters'

Report to the effect that "Officer Chivers fictionalized his need to quickly seize Mr. Ezeibe

before awaiting back-up officers, and before taking the time to read the CAD message that told

him the vehicle being driven by Mr. Ezeibe was not stolen."  (Doc. No. 61-3 at 10.)

In response, Plaintiff maintains that Dr. Peters applied the <u>Graham</u> factors in assessing

the force utilized by the officers, and argues that Dr. Peters' conclusion that Officer Chivers

"fictionalized" the need to quickly seize Plaintiff is "supported by facts and a recognized

methodology."  (Doc. No. 69 at 14.)  Specifically, Plaintiff maintains that:

> The facts that support this conclusion are that Officer Chivers did not wait for
> backup, even though there was no need to rush up and seize the Plaintiff, and
> Officer Chivers did not wait to read the MDT message informing him that the
> care was not stolen.  Obviously, he felt compelled to act rapidly, although the
> need to do so just wasn't there and hence was "fictionalized."

(<u>Id.</u>)

As a general matter, Defendants' challenge is unavailing.  The Court has already

concluded <u>supra</u> that the application of Dr. Peters' extensive experience, training, and skills to

the facts of this case is a reliable and appropriate methodology with regard to non-scientific

expert testimony such as that proffered here.[4]  Further, the Court concludes that Dr. Peters'

testimony as to national use-of-force standards and guidelines and whether the Defendants'

conduct during the incident at issue conformed to those standards is an appropriate subject of

expert testimony that will assist the jury in making an ultimate determination as to the

---

[4]  At the hearing on Defendants' motion, Defendants argued that Dr. Peters mistakenly applied
the <u>Graham</u> factors when conducting his assessment because he looked at the "crime committed"
as opposed to the "crime at issue" at the moment the individual is subjected to force.  (Doc. No.
75 at 44-46.)  Having concluded that Dr. Peters' methodology (the application of his extensive
experience to the facts of this case) is reliable, "[t]he analysis of the conclusions themselves is
for the trier of fact when the expert is subjected to cross-examination."  <u>See</u> <u>Kannankeril</u>, 128
F.3d at 807 (citing <u>In re Paoli</u>, 35 F.3d at 744).

reasonableness of Defendants' behavior under the totality of the circumstances.  See <u>Nye</u>, 2015 WL 11511583, at *6; <u>Jackson</u>, 2010 WL 3222137 at *14; <u>Burger</u>, 176 F.R.D. at 156.

However, while Dr. Peters may testify as to appropriate police procedures and whether the officers' conduct conformed to those procedures, the Court will not permit Dr. Peters to testify that Officer Chivers "fictionalized" the need to quickly seize Mr. Ezeibe or that the officers on the scene "<u>knew</u> from their Academy training that the elements were not present for them to use deadly force and/or non-deadly force on Mr. Ezeibe and <u>knew</u> that any physical force used by [them] on Mr. Ezeibe violated national use-of-force standards, training, and recommendations based upon the totality of the circumstances <u>known</u> to them at the time." (Doc. No. 61-3 at 10, 9) (emphasis added).  As noted above, such testimony is speculative, and strays into the province of the factfinder, amounting to an opinion on the ultimate legal question of excessive force, or whether the conduct of the officers, and the force they utilized, was reasonable under the totality of the circumstances.  See <u>Burger</u>, 176 F.R.D. at 157.  The Court will limit Dr. Peters' testimony accordingly.

## IV.   CONCLUSION

Based upon the foregoing, the Court will grant in part and deny in part Defendants' motion to preclude the expert report and opinions of John G. Peters, Jr.  An appropriate Order follows.